## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. _____ – Civ-

| | |
|---|---|
| CHARLOTTE MCCULLAGH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| BANYAN CAY RESORT FUND, LLC, | ) |
| BANYAN CAY RESORT FUND | ) |
| MANAGEMENT, LLC, DAVID FINKELSTEIN, | ) |
| JACQUELINE FINKELSTEIN-LEBOW, | ) |
| QENDRESE SADRIU-RRUSTEMI, and | ) |
| AMERICAN IMMIGRATION GROUP, LLC, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, Charlotte McCullagh (**"Plaintiff"** or **"McCullagh"**), by her undersigned attorneys, for her Complaint against Defendants Banyan Cay Resort Fund, LLC, Banyan Cay Resort Fund Management, LLC, David Finkelstein, Jacqueline Finkelstein-Lebow, Qendrese Sadriu-Rrustemi, and American Immigration Group, LLC (collectively, **"Defendants"**), alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the claims for violations of the Exchange Act asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

3.      Further, the documents at issue in this case provide for jurisdiction in this Court. Section 11.17 of the Banyan Cay Resort Fund, LLC Operating Agreement (the **"Operating Agreement"**) provides: "…each of the parties irrevocably and unconditionally (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement shall be brought in the federal or state courts seated in Palm Beach County, Florida; (b) consents to the jurisdiction of such court in any such suit, action or proceeding; and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in such court."

4.      Further, Section 11.8 of the Banyan Cay Resort Fund, LLC Subscription Agreement (the **"Subscription Agreement"**) provides: "Each party hereby irrevocably and unconditionally consents and submits to the exclusive jurisdiction of the courts of the State of Florida sitting in Palm Beach County and of the United States District Court for Southern District of Florida for any actions, suits or proceedings arising out of or relating to this Agreement[.]"

5.      Venue is proper in this District pursuant to Section 27 of the Securities Exchange Act of 1934 (the **"Exchange Act"**) (15 U.S.C. § 78aa) because Defendant Banyan Cay Resort Fund, LLC (the **"Company"**) maintains its registered office in West Palm Beach, Florida, which is situated in this District.

6.      Venue is further appropriate in this Court because, among other things, the parties stipulated and consented to jurisdiction in this forum in both the Subscription Agreement and the Operating Agreement.

## PARTIES

7.      Plaintiff, Charlotte McCullagh, is a resident of the State of New York.  Since September 25, 2018, McCullagh has been a Series A member of Defendant Banyan Cay Resort Fund, LLC.

Error! Unknown document property name.

8.      Defendant, Banyan Cay Resort Fund, LLC, is a Florida limited liability company having its registered office at 1615 Forum Place, Suite 3A, West Palm Beach, Florida 33401.  At all times relevant to the Complaint, the Company was doing business in Palm Beach County, Florida.  The Company's principal place of business is listed on the Florida Secretary of State website as 230 Park Avenue, #1549, New York, NY 10169.

9.      Defendant, Banyan Cay Resort Fund Management, LLC (**"BCRFM"**), is a Florida limited liability company having its principal place of business at 230 Park Avenue, #1549, New York, NY 10169.  At all times relevant to the Complaint, BCRFM was doing business in Palm Beach County, Florida.  BCRFM is the managing member of the Company.

10.     Defendant, David Finkelstein (**"Finkelstein"**, and collectively with Defendants Jacqueline Finkelstein-Lebow and Qendrese Sadriu-Rrustemi, the **"Controlling Individuals"**), is a resident of the State of New York.  Finkelstein is the sole member of BCRFM and, at all times relevant, has been responsible for controlling the day-to-day management and general business affairs of BCRFM and the Company along with the other Controlling Individuals.

11.     Upon information and belief, Defendant Jacqueline Finkelstein-Lebow (**"Finkelstein-LeBow"**) is a resident of the State of New York.  At all times relevant, Finkelstein-Lebow, together with the other Controlling Individuals, was responsible for controlling the general business affairs and day-to-day management of BCRFM and the Company.

12.     Upon information and belief, Defendant Qendrese Sadriu-Rrustemi (**"Rrustemi"**) is a resident of the State of New York.   At all times relevant, Rrustemi, together with the other Controlling Individuals, has been responsible for controlling the general business affairs and day-to-day management of BCRFM and the Company through her role with Defendant American Immigration Group, LLC.

3

13.     Defendant, American Immigration Group, LLC (**"AIG"**) is a Florida limited liability company having its principal place of business at 1298 Park Street, Atlantic Beach, NY 11509.  Through the Operating Agreement, Subscription Agreement, and Confidential Offering Memorandum dated December 16, 2016 (the **"Memorandum"**[1] and collectively with the Operating Agreement and Subscription Agreement, the **"Contracts"**), AIG was advertised as a company that provides advisory and management services to projects seeking to raise funds through the United States EB-5 immigrant investor program (the **"EB-5 Program"**) and was involved in the Company's EB-5 Program investment.  Finkelstein and Finkelstein-Lebow are founders, owners, and managers of AIG.  At all times relevant, upon information and belief, Finkelstein, Finkelstein-Lebow, and Rrustemi have jointly controlled the general business affairs of AIG.

## <u>NATURE OF THE CASE</u>

14.     The Company was formed as an investment vehicle for non-U.S. citizens to make investments through the EB-5 Program of the United States Immigration and Nationality Act (the **"Act"**).

15.     Among other things, under the Act, to enable an investor to become a permanent resident of the United States, the subject investment must be applied toward one or more qualifying capital investment projects anticipated to create the required number of jobs in a "Targeted Employment Area", designated by U.S. Citizenship and Immigration Services (**"USCIS"**).

---

[1] The Memorandum, and related documents defined herein including the Supplement 1 to the Memorandum, Supplement 2 to the Memorandum, and correspondence from the Company dated September 26, 2018 have confidentiality terms. Out of an abundance of caution for confidentiality concerns, these materials have not been appended as exhibits to the Complaint. The salient terms of those documents have been described in this pleading. By way of a separate motion, Plaintiff will seek judicial guidance concerning the confidentiality of these materials.

Error! Unknown document property name.

16.     In September 2018, McCullagh was a citizen of the United Kingdom who was living in the United States on an F-1 Visa.  As her visa was soon expiring, McCullagh was looking for an opportunity to gain lawful permanent residence in the United States.

17.     To that end, at that time, a friend introduced McCullagh to Finkelstein, an individual who worked as an adviser in the EB-5 area.  On the website of his company, AIG, Finkelstein describes himself as a "leading architect" of EB-5 Program investments.

18.     In September 2018, McCullagh spoke with Finkelstein over the phone. As detailed herein, in the first communication, Finkelstein explained to McCullagh that he and his company, AIG, had significant experience in the EB-5 financing industry.  Finkelstein and McCullagh discussed potential EB-5 investment opportunities, including an investment to become a Series A Member in the Company for an EB-5 investment/project that is issue in this lawsuit.

19.     In particular, Finkelstein explained to McCullagh that the Company was to use the proceeds from purchases of Series A preferred membership interests in the Company (the **"EB-5 Program Investment"**) – all provided by non-U.S. citizens – to make a secured loan (the **"Loan"**) to Banyan Cay Dev, LLC and its affiliate, Banyan Cay Resort & Golf, LLC (together, the **"Developers"**).  The Loan was to be provided to the business(es) most closely responsible for job creation in connection with the development of a resort and condominium properties on a planned golf resort in West Palm Beach, Florida (the **"Project"**) located in Palm Beach County, Florida.

20.     In that call, Finkelstein advised McCullagh about the safety of this particular investment vehicle.  According to Finkelstein, McCullagh's investment would be returned – either upon repayment of the Loan by the Developers or in the event that USCIC denied her Immigrant Petition by Alien Investor.

5

21.     After McCullagh's initial phone conversation with Finkelstein, on September 24, 2018, Rrustemi, one of the individuals who managed the day-to-day operations of AIG with Finkelstein, emailed McCullagh the Memorandum.  The Memorandum provided more details regarding the Company's EB-5 Program Investment and explained how a potential investment would be used.

22.     Building on McCullagh's prior conversation with Finkelstein, in the Memorandum, the Company further described the investment terms and key personnel who would be managing the investment.

23.     The Memorandum highlighted the Company's Managing Member, BCRFM, and the entities and individuals managing it.  Pursuant to the Memorandum, BCRFM was under the joint control of Finkelstein and Finkelstein-LeBow, acting through AIG.  The Memorandum further identified AIG as a group of affiliated companies founded, owned, and managed by Finkelstein and Finkelstein-LeBow that provided advisory and management services to projects seeking to raise funds through the EB-5 Program.

24.     Because both Finkelstein and the Memorandum explained to McCullagh that AIG would play a central role in the Company's EB-5 Program Investment, at that time, McCullagh also reviewed AIG's publicly available website, https://eb5aig.com/eb-5-past-projects/ (the **"AIG Website"**).  The Memorandum, together with the AIG Website, specifically lauded the putative wealth of experience of AIG and Finkelstein in past EB-5 projects and their reputation and acumen in the field of EB-5 Program financing.

25.     Through such representations and interactions, the Company, Finkelstein, and AIG made BCRFM and the Company's EB-5 Program Investment appear both to be a safe and reliable investment vehicle and a viable path to obtain permanent legal residency.

26.     Such representations were successful. In reliance upon them, on September 24, 2018, McCullagh executed the Series A Member Signature Page, accepting the terms of the Contracts.   Memorandum; Operating Agreement, attached to Memorandum as <u>Exhibit A</u>; Subscription Agreement, attached to Memorandum as <u>Exhibit B</u>.   On September 25, 2018, McCullagh invested $545,000.00 in the Company and became a Series A Member.

27.     In reality, however, the Company, BCRFM, AIG, Finkelstein and Finkelstein-Lebow concealed relevant information or misrepresented their respective experience, acumen, capabilities and qualifications to secure a lawful permanent residence for McCullagh.

28.     For example, Defendants intentionally failed to disclose to McCullagh that, upon information and belief, Finkelstein had recently departed from his former company, **Allied Capital Management and Development ("Allied Capital")**, under unsavory circumstances, irreparably damaging his reputation in this field.

29.     Further, upon information and belief, the other two individuals central to the Company's EB-5 Program—Finkelstein-Lebow, who was disclosed in the Memorandum, and Rrustemi, an individual through which the Company primarily communicated with Plaintiff from its very first email communication—had no relevant experience in the industry.

30.     Moreover, the AIG Website advertised EB-5 projects that pre-dated the formation of AIG as projects it had facilitated—when in fact it had not done so.

31.     Had the truth of these facts been disclosed, McCullagh would not have entrusted $545,000 with Defendants.

32.     Ultimately, the Company's lack of experience and ineptitude of its management team was borne out by their mishandling of McCullagh's investment.

33.     Defendants misapplied the funds Plaintiff invested in the Company's EB-5 Investment. This misconduct directly resulted in a decision dated September 7, 2022 by U.S. Citizenship and Immigration Services denying McCullagh's application for lawful permanent residence.

34.     Compounding their fraudulent inducements and concealment of key facts, following the denial of McCullagh's residency application, Defendants committed a series of other unlawful acts.

35.     Under the unambiguous terms of the Contracts, upon the denial of McCullagh's application and a decision to waive her right to appeal the decision, the Company was obligated to return her investment.

36.     To date, despite repeated requests by McCullagh, in breach of the Contracts, the Company has refused to return even a single penny of her investment.

37.     In addition, shortly after McCullagh's petition was denied, the Project, which was funded in part by McCullagh's (and other investors') investment began to unravel. Upon information and belief, on or about February 13, 2023, the parties to the Project reached an agreement that would have resulted in a substantial—if not total—return to investors like Plaintiff, including the possibility of making up any future shortfall.

38.     However, upon information and belief, on or about February 15, 2023, BCRFM and the entity and individuals who control it – AIG, Finkelstein, Finkelstein-Lebow, and Rrustemi – opposed and thwarted this sale. They did so because in the transaction as contemplated, they would not be able to recoup their own fees. In so doing, BCRFM, AIG, Finkelstein, Finkelstein-Lebow, and Rrustemi placed their personal interests above those of the members of the Company, including McCullagh.

Error! Unknown document property name.

39.     The obstacles these defendants placed helped force the Developers and their related entities into bankruptcy in a case captioned *In re Banyan Cay Resort & Gold, LLC*, 23-112386-EPK, currently pending in the United States Bankruptcy Court for the Southern District of Florida (the **"Bankruptcy"**).

40.     In the Bankruptcy, as of September 6, 2023, a credit bidder acquired title to the real property upon which the Project was being developed.  The sale price was $96.5 million, which, upon information and belief, is $16.5 million less than the proposed sale that, upon information and belief, was opposed less than one year earlier by BCRFM, AIG, Finkelstein, Finkelstein-Lebow, and Rrustemi.

41.     Accordingly, due to the conduct of Defendants, McCullagh and the investors in the Company will not receive any repayment on their investments either through the Bankruptcy or in settlements reached outside of the Bankruptcy; and outside the Bankruptcy, Defendants have refused to take any steps required under the Contracts required of them to repay McCullagh's subscription amount.

42.     Finally, to investigate the matters described above, on March 9, 2023, McCullagh made a books and records demand upon the Company pursuant to Fla. Stat. § 605.0410 (the **"Records Act"**).

43.     Without providing a colorable basis under applicable law, the Company refused to supply to McCullagh (a member of the Company) the information and records required under the Records Act.

44.     Accordingly, this is an action to address Defendants' fraudulent misrepresentations and key omissions in connection with an offering of securities in the Company in violation of

Error! Unknown document property name.

Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5; common law fraud; breaches of the Contracts; breaches of fiduciary duties; and the Company's violation of the Records Act.

**FACTS COMMON TO ALL COUNTS**

**A.      Background on the Company and the Company's EB-5 Investment.**

45.      In 2015, AIG, Finkelstein, and Finkelstein-Lebow formed the Company to make investments through the EB-5 Program, created under the Act.

46.      The EB-5 Program is a U.S. government program designed specifically to serve foreign nationals seeking to become eligible to obtain lawful permanent residence in the United States by making a qualifying investment through a "regional center", as that term is defined at 8 CFR 204.6(e), approved under the Immigrant Investor Pilot Program, as provided at 8 CFR 204.6(m).

47.      Thus, to satisfy the requirements of the Act, all investments made by the Company must be in one or more qualifying capital investment projects anticipated to create the required number of jobs in a "Targeted Employment Area", defined under the Act, as part of a regional center.

48.      As part of the Company's EB-5 Investment, the Company was going to use the proceeds of the Company's EB-5 Program Investment – all purchased by non-U.S. citizens – to make the Loan to the Developers.  The Loan was to be provided to the business(es) most closely responsible for job creation in connection with the Project.

49.      As provided in the Memorandum, the Company is managed by BCRFM.  "The Managing Member of the Company is Banyan Cay Resort Fund Management, LLC, a Florida limited liability company jointly owned and controlled by David Finkelstein and Jacqueline Finkelstein-LeBow."  Memorandum, §I.

Error! Unknown document property name.

50.     The Memorandum further explains: "Under Florida law, the Managing Member has fiduciary duties of care and loyalty to the Company and its Members. The duty of care requires the Managing Member to make informed decisions and consider carefully all available information before arriving at a decision. The duty of loyalty requires the Managing Member to act in good faith and in the best interests of the Company, and to put the Company's interests above the personal interests of the Managing Member or its owners." *Id*.

51.     The Memorandum goes on to detail the role of BCRFM, AIG, Finkelstein and Finkelstein-Lebow: "The Managing Member [BCRFM] is under the ultimate control of American Immigration Group which is under the ultimate joint control of David Finkelstein and Jacqueline Finkelstein-LeBow." Id., §VI.

52.     At all times relevant to this Complaint, Rrustemi has also participated in the control of AIG and, through that role, the control of the Company.

**B.     Relevant Terms of the Contracts.**

53.     Beginning in December 2016, the Company began offering the EB-5 Program Investment, in the form of Series A preferred membership interests in the Company.  The terms of the EB-5 Program Investment are described in the Memorandum, as supplemented by "Supplement Number 1," dated September 25, 2018 (**"Supplement 1"**), as further supplemented by "Supplement Number 2," dated October 2, 2020 (**"Supplement 2"**).

54.     Pursuant to the EB-5 Program, the EB-5 Program Investment was offered exclusively to non-U.S. residents.

55.     To become a Series A Member in the Company, a potential investor was required to purchase a Series A Unit at a subscription price of $500,000.00 (the "Subscription Amount"). Subscription Agreement, §1.

11

56.     The Company was required to apply each investor's Subscription Amount to the Loan to the Developers.  Memorandum, §XI. The Developers, in turn, were required to apply the Loan toward one or more qualifying capital investment projects anticipated to create the required number of jobs in a Targeted Employment Area under the EB-5 Program.  Subscription Agreement, Recital F.

57.     In addition, a potential investor was required to pay a $55,000.00 fee per Series A Unit "to compensate the Company for a portion of its Offering expenses" (the **"Administrative Fee"**).  *Id.*  An unspecified portion of the Administrative Fee was paid directly to AIG. Memorandum, §I.

58.     Under the Subscription Agreement, the Company could reduce or waive a subscriber's obligation to pay the Administrative Fee.  Subscription Agreement, Recital F.

59.     The Memorandum further provided that the Company was required to establish a Reserve Account:

> The Company will establish the Reserve Account with the Escrow Agent and, prior to initial release of Subscription Amounts from the Escrow Account, will cause the Developers to deposit $1.5 million into the Reserve Account. The Developers are required to maintain a $1.5 million minimum balance in the Reserve Account and are not permitted to use Loan proceeds to fund the Reserve Account. The Escrow Agent will release funds from the Reserve Account to enable the Company to return the Subscription Amount or Administrative Fee of any subscriber who becomes entitled to return after his or her Subscription Amount or Administrative Fee has been released from the Escrow Account.

Memorandum, §XIII.

60.     Supplement 2 reduced the amount that the Company was required to retain in the Reserve Account to $500,000.00 for subscribers who invested $500,000.  Supp. 2, §VII.

61.     Pursuant to the Memorandum, in certain circumstances, the Company could become required to repay a subscriber's Subscription Amount prior to the repayment of the Loan:

Error! Unknown document property name.

The Company will not be obligated to return a Series A Member's Subscription Amount prior to repayment of the Loan **unless (i) USCIS denies the Series A Member's I– 526 Petition and all administrative rights of appeal have been exhausted or waived** or (ii) the Series A Member voluntarily withdraws his or her I–526 Petition prior to USCIS adjudication.

Memorandum, §XIII (emphasis added).

62.     In the event that a subscriber became entitled to a return of his or her Subscription Amount, the Memorandum outlined steps that the Company was required to take:

In either event, the Series A Member will provide notice to the Company, which notice will include copies of all USCIS correspondence relating to the Series A Member's I–526 Petition. Thereafter, the Company will take the following steps in the following order to facilitate a return of the Series A Member's Subscription Amount:

(1) The Company will cause the Escrow Agent to release funds to the Company from the Reserve Account, provided there are sufficient funds in the Reserve Account to enable the Escrow Agent to do so;

(2) The Company will use commercially reasonable efforts to replace the Series A Member with a substitute subscriber and return the Series A Member's Subscription Amount within 90 days after notice of denial or withdrawal; and

(3) Within 180 days after notice of denial or withdrawal, the Company will cause the Developers to make a mandatory prepayment of Loan principal under the Early Release Guaranty to enable the Company to return the Series A Member's Subscription Amount, to the extent loaned to the Developers and to the extent Reserve Account funds are not available.

Memorandum, §XIII; *see also* Operating Agreement, §§2.7.1-2.7.1.3.

63.     The Memorandum also provided for the mandatory return of a subscriber's Administrative Fee under certain circumstances, including:

(2) The Company will return the entire Administrative Fee of a Series A Member if USCIS denies the Series A Member's I–526 Petition (and all administrative rights of appeal have been exhausted or waived) **due to a failure of the Company or the Project to comply with EB–5 Program requirements**.

Memorandum, §XIII (emphasis added); *see also* Operating Agreement, §2.8.1.

Error! Unknown document property name.

64.     In the event a subscriber became entitled to a return of his or her Administrative Fee, the Memorandum provides:

> Upon receipt of a direction from the Company, the Escrow Agent will release funds to the Company from the Reserve Account to fund any obligation to return a Series A Member's Administrative Fee, provided there are sufficient funds in the Reserve Account to enable the Escrow Agent to do so. Otherwise, the Company will use commercially reasonable efforts to return the portion of the Administrative Fee to which the Series A Member may be entitled, if any, within 60 days following notification of the denial or withdrawal, although the Company may lack the resources to satisfy this obligation.

Memorandum, §XIII; *see also* Operating Agreement, §§2.8.3-2.8.3.2.

65.     Supplement 2 explicitly provides that it is to be read in conjunction with the Memorandum and is qualified by reference to the Memorandum, except to the extent that the information used in Supplement 2 expressly supersedes information contained in the Memorandum. Supp. 2, p. 1.

66.     Notably, nothing in Supplement 2 altered the terms of the Memorandum relating to the Company's obligation to return a subscriber's Subscription Amount or Administrative Fee under the circumstances quoted above.  Memorandum, §XIII; Operating Agreement, §§2.7.1-2.7.1.3, 2.8.1, and 2.8.3-2.8.3.2.

**C.     To Induce McCullagh's Investment in the Company, Defendants Misrepresent Their Experience and Acumen and the Risks of the Company's EB-5 Program Investment.**

67.     In September 2018, McCullagh, a citizen of the United Kingdom, was residing in the United States on an F-1 Visa.  Because the expiration date of her F-1 Visa was approaching, McCullagh was looking for an opportunity to obtain lawful permanent residence and, ultimately, citizenship in the United States.  A friend introduced her to Finkelstein for that purpose.

14

68.     On or about September 24, 2018, McCullagh spoke with Finkelstein over the phone.  During this call, Finkelstein touted the experience and success that he and his Company, AIG, had in the EB-5 financing industry.

69.     Finkelstein and McCullagh discussed potential investment opportunities for McCullagh to gain her Green Card through the EB-5 Program, and Finkelstein recommended that McCullagh invest in the Company's EB-5 Program Investment.  Finkelstein verbally assured McCullagh that the Company's EB-5 Program Investment was a safe investment because she was guaranteed to get her investment back, either when the Loan was repaid by the Developers or upon USCIS's denial of her Immigrant Petition by Alien Investor.

70.     Immediately following this call, on September 24, 2018, Rrustemi emailed the Memorandum to McCullagh.  The Memorandum provided more details regarding how a non-U.S. citizen could make an investment through the EB-5 Program by becoming a Series A Member in the Company, and included details regarding how the EB-5 Program Investment would be used.

71.     As explained to McCullagh both in the phone call and in the Memorandum, the Company was to use the proceeds the EB-5 Program Investment to make a secured Loan to the Developers for the Project.  The Loan was to be provided to the business(es) most closely responsible for job creation in connection with the Project.  Memorandum, p. 4; Subscription Agreement, Recital F.

72.     The Memorandum also highlighted the key entities and individuals involved in the EB-5 Program Investment.  In particular, the Company highlighted the Company's Managing Member, BCRFM, and the entities and individuals managing it.  Pursuant to the Memorandum, BCRFM was under the joint control of Finkelstein and Jacqueline Finkelstein-LeBow, acting through AIG.  The Memorandum further identified AIG as a group of affiliated companies

Error! Unknown document property name.

founded, owned, and managed by Finkelstein and Finkelstein-LeBow that provided advisory and management services to projects seeking to raise funds through the EB-5 Program.  Memorandum, §I.

73.     Because both Finkelstein and the Memorandum explained to McCullagh that AIG would play a central role in the Company's EB-5 Program Investment, prior to deciding to invest, McCullagh reviewed the AIG Website. The Memorandum, together with the AIG Website, specifically lauded the putative wealth of experience of AIG and Finkelstein in past EB-5 projects and their reputation and acumen in the field of EB-5 Program financing.

74.     As the EB-5 Program Investment was structured so that AIG would be central to the facilitation of the qualifying investment, before signing the Memorandum, McCullagh reviewed the AIG Website in making her decision whether to invest in the Company's EB-5 Program Investment.

75.     Notably, the AIG Website listed projects totaling nearly $700 million in EB-5 funding that AIG claimed it had facilitated.

76.     Upon information and belief, and not disclosed on the AIG Website, the vast majority of these projects were completed prior to AIG's formation and so it had no such involvement.

77.     The AIG Website also described Finkelstein as "one of the leading architects of the EB-5 industry since 2008."

78.     This statement was false.  Instead, upon information and belief, prior to forming AIG, Finkelstein had been affiliated with a company known to be an industry leader in EB-5 financing, Allied Capital.  Finkelstein's separation from Allied Capital was the subject of a lawsuit, *Allied Capital and Development of South Florida, Harbourside Place, LLC v. David Finkelstein*,

Error! Unknown document property name.

Case No. 2014CA006733, filed June 2014 in the Circuit Court of the Fifteenth Judicial Circuit in Palm Beach County, Florida (the **"Allied Capital Litigation"**).

79.     Upon information and belief, the Allied Capital Litigation irreparably damaged Finkelstein's credibility and standing within the EB-5 community and his relationships with other EB-5 related professionals, negatively affecting his ability to facilitate qualifying investments under the EB-5 Program, and so he was no longer "a leading architect" in this industry.

80.     At no time prior to McCullagh's decision to join the EB-5 Program Investment did Defendants disclose the Allied Capital Litigation to McCullagh.

81.     In addition, upon information and belief, Finkelstein-Lebow, who is featured in the Memorandum, and Rrustemi, who was the individual through which the Company primarily communicated with Plaintiff, had no experience with EB-5 Programs at the time the Memorandum was created.  Defendants did not disclose this to McCullagh.

82.     McCullagh relied upon the on the misstatements regarding the expertise of AIG and the Controlling Individuals in the field of EB-5 financing.  McCullagh trusted that Defendants would ensure her Subscription Amount would be correctly applied in accordance with the requirements of the EB-5 Program and the terms of the Memorandum, enabling McCullagh to successfully apply for and obtain and Green Card through the EB-5 Program.

83.     McCullagh also relied upon Finkelstein's assurances about the safety of her investment.

84.     In reliance upon the statements in the Memorandum, on the AIG Website, and by Finkelstein on their phone call, on September 25, 2018, McCullagh executed the Contracts, and purchased a Series A Unit in the Company for $500,000.00 (the Subscription Amount), plus

Error! Unknown document property name.

$45,000.00 as a reduced Administrative Fee, which was agreed to by the Company pursuant to correspondence from the Company dated September 26, 2018.

**D.      McCullagh's Petition for a Green Card is Denied Due to Defendants' Misapplication of Her Subscription Amount.**

85.      On December 6, 2018, McCullagh filed her Immigrant Petition by Alien Investor (**"I-526 Petition"**), pursuant to Section 203(b)(5) of the Immigrant and Nationality Act with USCIS.  Pursuant to the Contracts, AIG and the Controlling Individuals reviewed the I-526 Petition before it was submitted.  Memorandum, §XII; Subscription Agreement, §3.3.2.

86.      The I-526 Petition was based upon McCullagh's investment of the Subscription Amount towards a qualifying investment project under the EB-5 Program.

87.      In support of the I-526 Petition, McCullagh submitted the Contracts that were created by the Defendants.

88.      On September 7, 2022, USCIS denied McCullagh's I-526 (the **"Denial"**).  As stated in its decision, the USCIS denied the Petition based on the Company's failure, through the actions of the Controlling Individuals, to comply with the EB-5 Program Requirements and the terms of the Memorandum.  A copy of the Denial is attached hereto as **Exhibit 1**.

89.      Specifically, Defendants failed to make McCullagh's Subscription Amount available to the business(es) most closely responsible for job creation.  Ex. 1, p. 7.

90.      Instead, on November 8, 2021, Defendants provided documentation to USCIS that showed that the Subscription Amount was not loaned to the Developers or another entity affiliated with the job-creating entities, as described in the Memorandum and as had been explained by Finkelstein on his call with McCullagh.

91.      Instead, USCIS found that the Company loaned the Subscription Amount to the Project by transferring to the funds to the Iota Trust account of the law firm of Cherry Edgar Smith

Error! Unknown document property name.

PA for the purpose of paying off construction liens.  Ex. 1, pp. 6-7. Nothing in the Memorandum, or the Loan agreement entered with the Developers (which the Company provided to USCIS), contemplated this use of McCullagh's investment.  Ex. 1, p. 7.  Nor could they: construction liens were not part of the "approved project costs" and in using the Loan to pay construction liens, the Company failed to provide the Loan to a "job-creating entity." *Id*.

92.     If AIG and the Controlling Individuals had the experience and acumen that they touted through the Contracts, on the AIG web site, and in Finkelstein's conversation with McCullagh, Defendants should have, and would have, known that this misuse of McCullagh's investment would result in a denial of her I-526 Petition.

**E.     In Breach of the Contracts,  the Company Refuses to Return McCullagh's Subscription Amount and Administrative Fee.**

93.     Following the Denial, McCullagh did not file, and waived her right to file, an appeal of the Denial. Pursuant to Section XIII of the Memorandum, and Sections 2.7.1-2.7.1.3, 2.8.1, and 2.8.3-2.8.3.2 of the Operating Agreement, this entitled her to the return of her Subscription Amount and Administrative Fee.

94.     On October 26, 2023, McCullagh provided written notice to the Company of the Denial and copies of correspondence with USCIS, pursuant to §XIII of the Memorandum.

95.     Following the Denial, McCullagh had thirty (30) days in which to file an appeal. McCullagh waived her right to do so.

96.     As unambiguously provided under §XIII of the Memorandum, the Subscription Amount was due to McCullagh by no later than April 24, 2023, one hundred eighty (180) days from the date McCullagh provided the Company with notice of the Denial.  Memorandum, §XIII; see also Operating Agreement, §§2.7.1-2.7.1.3.

Error! Unknown document property name.

97.     Further, because the Denial was due to the Company's failure to comply with EB-5 Program requirements, the Company was required to return McCullagh's Administrative Fee by no later than sixty (60) days following notice of the Denial, December 25, 2022.  Memorandum, §XIII; see also Operating Agreement, §§2.8.1, 2.8.3-2.8.3.2.

98.     Notwithstanding these facts, the Company failed to return to McCullagh either the Subscription Amount or Administrative Fee.

99.     Specifically, the Company did not: (i) cause the Escrow Agent release funds to the Company from the Reserve Account (Operating Agreement, §2.7.1.1); (ii) use commercially reasonable (or any) efforts to replace the Series A Member (*i.e.,* McCullagh) with a substitute subscriber and return the Series A Member's Subscription Amount within ninety days after notice of the Denial (*id.*, §2.7.1.2 ); and (iii) cause the Developers to make a mandatory prepayment of Loan principal under the Early Release Guaranty to enable the Company to return the Series A Member's Subscription Amount within one hundred eighty days after notice of the Denial (*id.*, §2.7.1.3).  *See also* Memorandum, §XII.

100.    To date, the Company has continued to refuse to return McCullagh's Subscription Amount and Administrative Fee.

**F.      Proposed Sale of the Project.**

101.    On October 15, 2020, the Company entered into a mezzanine loan agreement for the Loan with Banyan Cay Mezzanine Borrower, LLC (the **"Mezzanine Borrower"**), the direct legal and beneficial owner of one hundred percent (100%) of the issued and outstanding limited liability company interests in each of the Developers.

102.    The Loan was subordinated to a loan between the Developers and a senior lender, U.S. Real Estate Credit Holdings III-A, LP (the **"Senior Lender"**).

Error! Unknown document property name.

103.     As part of the Loan, AIG was paid a 1% origination fee.  Upon information and belief, this origination fee benefited the Controlling Individuals.

104.     In addition, the Mezzanine Borrower was required to prepay a full year of interest to the Company, or $350,000.00.  This amount was not distributed to the Series A Members of the Company, but inured solely to the benefit of AIG and the Controlling Individuals.

105.     Upon information and belief, in April 2022, the Developers decided to sell their assets, rather than complete the Project.

106.     Upon information and belief, on September 16, 2022, the Developers entered into a purchase and sale agreement (the **"PSA"**) with 2020 Banyan LLC to sell almost all of their respective real property.

107.     Upon information and belief, despite the PSA, on or about December 16, 2022, BCRFM, AIG and the Controlling Individuals began the process to schedule a strict foreclosure sale of the equity pledged by the Mezzanine Borrower on account of the Loan, which was scheduled for February 17, 2023 (the **"UCC Sale"**).

108.     Upon information and belief, the PSA was re-negotiated in mid-January 2023 and, on February 13, 2023, the Developers and an affiliate of 2020 Banyan LLC entered into a second amendment to the PSA, with a purchase price of $113 million.  Under this re-negotiated price, upon information and belief, the Company would have received a substantial initial recovery of its Loan.  This transaction would have provided the possibility that the Company—and, concomitantly, McCullagh as a Series A Member—would eventually be substantially, if not completely, re-paid her Subscription Amount.

109.    However, upon information and belief, on or around February 15, 2023, Defendants informed the Developers and Mezzanine Borrower that the deal contemplated under the PSA was unacceptable and it would refuse to adjourn the scheduled UCC Sale.

110.    Upon information and belief, disregarding the immediate substantial recovery and possibility of eventual payment in full to the Company's Series A Members, the Controlling Individuals opposed the transaction contemplated by the PSA for the reason that it would not cover over $1 million in fees and interest that inured solely to their benefit.

111.    Upon information and belief, due to the Defendants' actions in opposing the PSA, on February 16, 2023, the Mezzanine Borrower and related entities filed the Bankruptcy.

112.    On September 11, 2023, BCRFM, through Finkelstein, provided notice to the Series A Members of the Company that a credit bidder in the bankruptcy acquired title to the Project for a total price of $96.5 million.  This was $16.5 million less than the sale contemplated under the PSA as re-negotiated.

113.    In this notice, BCRFM further informed the Series A Members that they would not receive any repayment of their investment through the bankruptcy court sale.

114.    On November 27, 2023, BCRFM, through Finkelstein, provided notice to the Series A Members of the Company that the Company was conducting settlement discussions with the Senior Lender.  In this notice, BCRFM informed the Series A Members that even if the Company reached a settlement with the Senior Lender, it is unlikely that the Series A Members will receive any repayment of their investment through this settlement.

Error! Unknown document property name.

**G.      McCullagh's Books and Records Demand.**

115.    Following the Denial, on March 9, 2023, McCullagh made a Demand for Inspection of Books and Records of the Company, pursuant to the Records Act (the **"Books and Records Demand"**).  A copy of the Books and Records Demand is attached hereto as **Exhibit 2**.

116.    As explained in the Books and Records Demand, McCullagh made the demand for a number of reasons that are reasonably related to her interests as a member of the Company.

117.    Specifically, McCullagh sought the information to understand: (i) how her Subscription Amount was applied; (ii) whether the proceeds were released from the Escrow Account in compliance with the terms of the Contracts; (iii) her rights as they pertained to her Subscription Amount and the Administrative Fee owed to her; (iv) the Company's compliance with the terms of the Contracts; (v) whether the Company had treated all Series A Members consistently, including with regard to the return of any Series A Member's Subscription Amount and/or Administrative Fee; and (vi) BCRFM's potential mismanagement. Ex. 2, p. 2.

118.    In the Books and Records Demand, McCullagh listed the specific documents that she sought.  Ex. 2, pp. 2-4.

119.    The Company did not respond to the Books and Records Demand until May 15, 2023 (the **"Response"**).  A copy of the Response is attached hereto as **Exhibit 3**.

120.    In Response to the Books and Records Demand, the Company produced only (i) documents related to the appeal of a denial of an I-526 Petition of a different member; and (ii) a copy of a complaint it filed against the Senior Lender.  None of these documents were requested by McCullagh or were otherwise relevant to her Books and Records Demand.

121.    To date, the Company has refused to produce any of the documents requested in the Books and Records Demand.

Error! Unknown document property name.

122.    Upon information and belief, the Company, through the Controlling Individuals, has refused to produce the documents requested by the Books and Records Demand to conceal the full extent of their mismanagement.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
*Against all Defendants*

123.    McCullagh adopts and incorporates the allegations of Paragraph 1 through 122 as and for this Paragraph 123.

124.    In connection with offering the EB-5 Program Investment, Defendants: (i) employed manipulative or deceptive devices, and (ii) knowingly made false statements of material facts and intentionally concealed material facts in the Memorandum, on the AIG Website, and in conversation with McCullagh, about Defendants' experience, acumen, and reputation, and about the risks involved in the Company's EB-5 Investment, and intentionally omitted other material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, regarding their experience and reputation in the field of EB-5 financing, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

125.    McCullagh relied upon these misrepresentations in purchasing a Series A Membership in the Company.  Had she known of the facts concealed or misrepresented, she would not have invested in the Company.

126.    At all times, Defendants knew that these misrepresentations and omissions were false or, in light of the circumstances under which they were made, misleading.

127.    BCRFM, AIG, and the Controlling Individuals directly benefitted from these misrepresentations, including without limitation, in the form of the Administrative Fee.

Error! Unknown document property name.

128.     As a direct and proximate result of this wrongful conduct, McCullagh has suffered damages in connection with her purchase of the Subscription Amount and Administrative Fee.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
*Against the Controlling Individuals*

129.     McCullagh adopts and incorporates the allegations of Paragraph 1 through 122 as and for this Paragraph 129.

130.     In connection with offering the EB-5 Program Investment, the Company, through the Controlling Individuals: (i) employed manipulative or deceptive devices, and (ii) knowingly made false statements of material facts in the Memorandum and in conversation with McCullagh, about Defendants' experience, acumen, and reputation, and about the risks involved in the Company's EB-5 Investment, and omitted other material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, regarding their experience and reputation in the field of EB-5 financing, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

131.     The Controlling Individuals acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  At all times relevant, the Controlling Individuals had the power to control the general business affairs of the Company, and through their roles with AIG, and the power to control or influence the public statements made by AIG and the Company.

132.     By reason of such conduct, the Controlling Individuals are liable pursuant to Section 20(a) of the Exchange Act.

Error! Unknown document property name.

## COUNT III
## Fraudulent Inducement
### *Against all Defendants*

133.     McCullagh adopts and incorporates the allegations of Paragraph 1 through 122 as and for this Paragraph 133.

134.     In connection with offering the EB-5 Program Investment, Defendants intentionally made false statements of material fact, and omitted material facts, in the Memorandum, on the AIG Website, and by Finkelstein in his call with McCullagh regarding the Defendants' experience and reputation in the field of EB-5 financing and the safety of the Company's EB-5 Program Investment.

135.     The Defendants knew of the falsity of the statements and intended that McCullagh and other potential subscribers would rely upon these statements to invest in the Company.

136.     McCullagh relied on these misrepresentations and omissions in investing in the Company.

137.     As a direct and proximate result of this wrongful conduct, McCullagh has suffered damages through the loss of the Subscription Amount and Administrative Fee.

138.     Under Florida law, punitive damages are warranted for this intentional, fraudulent conduct.

## COUNT IV
## Breach of the Contracts
### *Against the Company*

139.     McCullagh adopts and incorporates the allegations of Paragraph 1 through 122 as and for this Paragraph 139.

140.     The Contracts are a valid and enforceable contract between McCullagh and the Company.

Error! Unknown document property name.

141.    Pursuant to the Contracts, after the Denial and waiver of McCullagh's right to appeal, the Company was obligated to return McCullagh's Administrative Fee by December 25, 2023.

142.    Further, pursuant to the Contracts, after the Denial and waiver of McCullagh's right to appeal, the Company was obligated to return McCullagh's Subscription Amount by April 24, 2023.

143.    In breach of the Contracts, the Company did not: (i) cause the Escrow Agent release funds to the Company from the Reserve Account (Operating Agreement, §2.7.1.1); (ii) use commercially reasonable (or any) efforts to replace the Series A Member (*i.e.,* McCullagh) with a substitute subscriber and return the Series A Member's Subscription Amount within ninety days after notice of the Denial (*id.*, §2.7.1.2 ); and (iii) cause the Developers to make a mandatory prepayment of Loan principal under the Early Release Guaranty to enable the Company to return the Series A Member's Subscription Amount within one hundred eighty days after notice of the Denial (*id.*, §2.7.1.3).  *See also* Memorandum, §XII.

144.    The Company has breached the Contracts by refusing to return McCullagh's Subscription Amount and Administrative Fee.

145.    As a direct result of the Company's breach of the Contracts, McCullagh has suffered damages, in the amount of her unreturned Subscription Amount and Administrative Fee, as well as pre-judgment interest.

## COUNT V
### Breach of Fiduciary Duty
### *Against the BCRFM, AIG, and the Controlling Individuals*

146.    McCullagh adopts and incorporates the allegations of Paragraph 1 through 122 as and for this Paragraph 146.

27

147.    As the managing member of the Company, BCRFM, and AIG and the Controlling Individuals who, in turn, control BCRFM, owe fiduciary duties to the members if the Company, including the duty of loyalty.

148.    BCRFM, AIG, and the Controlling Individuals breached the duty of loyalty in opposing the PSA, which would have allowed the members to recover some or all of their investment, for the sake of recouping their own fees.

149.    BCRFM, AIG, and the Controlling Individuals took these actions with willful disregard to the rights of McCullagh and the other members of the Company.

150.    As a direct and proximate result of this breach of fiduciary duty, McCullagh has been damaged, in an amount to be proven at trial.

151.    Under Florida law, punitive damages are warranted for this willful conduct.

**COUNT VI**
**Inspection of Books and Records**
***Against the Company***

152.    McCullagh adopts and incorporates the allegations of Paragraph 1 through 122 as and for this Paragraph 152.

153.    At all times relevant, McCullagh has been a member of the Company, which is a manager-managed Florida limited liability company.

154.    Pursuant to Fla. Stat. § 605.0410, on March 9, 2023, McCullagh demanded to inspect records of the Company reasonably related to her interest as a member of the Company, as set forth in the Books and Records Demand.  Ex. 2.

155.    To date, the Company has not allowed McCullagh to inspect the records demanded, as required by Fla. Stat. § 605.0410.

Error! Unknown document property name.

156.    Pursuant to Fla. Stat. § 605.0411, McCullagh seeks an order compelling an inspection of the demanded records.

157.    Pursuant to Fla. Stat. § 605.0411(2), McCullagh is entitled to recover her reasonable attorneys' fees and costs in seeking this court-ordered inspection.

**WHEREFORE**, Plaintiff Charlotte McCullagh respectfully requests that this Court award the following relief:

a.    Awarding Plaintiff compensatory damages for Defendants' wrongful conduct, in an amount to be proven at trial;

b.    Assessing punitive damages against Defendants and in favor of Plaintiff;

c.    Compelling an inspection of the records demanded in McCullagh's Books and Records Demand, as specified in Exhibit 2, and awarding McCullagh her reasonable attorneys' fees and costs incurred in seeking this inspection; and

d.    Granting such other and further relief as the Court may deem just, equitable and proper.

## <u>DEMAND FOR JURY TRIAL</u>

The Plaintiff hereby demands Trial by Jury of all issues so triable.

Dated: January 24, 2024                              Respectfully submitted,

**William E. Calnan**
/s/*William E. Calnan*

THE TARICH LAW FIRM P.A.
1946 Tyler Street
Hollywood, Florida 33020
Telephone: (305) 503-5095
Facsimile: (866) 858-1226
Primary Email: Wcalnan@TarichLaw.com
Second Email:Assistant2@TarichLaw.com

By: */s/ William E. Calnan*
William E Calnan, Esq.
Florida Bar No. 938785

PATZIK, FRANK & SAMOTNY LTD.
Jonathan S. Goodman (ARDC # 6256015)
Elizabeth L. Archerd (ARDC # 6329394)
200 South Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312)551-8300
jgoodman@pfs-law.com
earcherd@pfs-law.com
*Motions pro hac vice impending*

*Attorneys for Plaintiff Charlotte McCullagh*

30

**Error! Unknown document property name.**